IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHEILA J. FURLOW, )
)
    Plaintiff, )
)
v. ) Civil No. 10-554-CJP
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
    Defendant. )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Sheila J. Furlow is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

## Procedural History

Ms. Furlow applied for benefits on October 18, 2005, alleging disability beginning on September 4, 2005. (Tr. 95-103). She later amended her alleged onset date to December 14, 2007. (Tr. 9).

Plaintiff had filed a previous application in 2003, which was denied at the Appeals Council level on January 31, 2006. That decision was not appealed. (Tr. 9).

The present application was denied initially and on reconsideration. After holding a hearing, ALJ Lawrence D. Wheeler denied the application for benefits in a decision dated June

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 12.

1

19, 2009. (Tr. 9-17). Plaintiff's request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff argues that the ALJ erred in the following respects:

1. He erred in rejecting the RFC assessment prepared by a psychiatric nurse on the basis that she was not an acceptable medical source.

2. His RFC assessment was not supported by substantial evidence because he erred in weighing the medical opinions.

3. He failed to properly assess Ms. Furlow's credibility.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Ms. Furlow is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richard v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384,**

**1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Wheeler followed the five-step analytical framework described above. He determined that Ms. Furlow had not been engaged in substantial gainful activity since the alleged onset date, and that she has severe impairments of fibromyalgia and major depression. He further determined that these impairments do not meet or equal a listed impairment. The ALJ found that Ms. Furlow has the residual functional capacity to perform a limited range of work at the light exertional level. Based on the testimony of a vocational expert, the ALJ found that Ms. Furlow has the capacity to perform the jobs of small products assembler and back office helper, both of which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.    Agency Forms**

Ms. Furlow was born in 1958, and was 49 years old when she allegedly became disabled. She was last insured for DIB as of December 31, 2008. (Tr. 127).

She had previously worked in a loan servicing office and as a checker/stocker at Wal-Mart. (Tr. 130-131). She submitted an Activities of Daily Living Questionnaire in which she stated that her husband and daughter do the household chores and cooking. She stated that she has difficulty with concentration and memory, and that she only leaves home once a week for

therapy appointments. She said that she does not leave home alone because she gets lost very easily. She denied doing activities such as driving, reading or talking on the phone. (Tr. 118-126).

In a Disability Report, plaintiff stated that she was unable to work due to fibromyalgia and a heart condition, which make her unable to sit or stand for long and cause chronic pain. She said she stopped working on June 12, 2003, because she was fired. (Tr. 148).

In a later report, plaintiff stated that her fatigue, pain and depression began getting worse in January, 2006. (Tr. 172). She later reported that her fatigue, leg spasms, sleep disturbance, pain and depression all got worse as of June 16, 2006. (Tr. 183).

**2.     Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on April 9, 2009. (Tr. 20).

Ms. Furlow last worked in 2003. She initially alleged an onset date of September 4, 2005, because that was the day after her first application for benefits was denied. (Tr. 21-22). Plaintiff's counsel orally moved to amend the onset date to December 14, 2007, and the ALJ granted the amendment. (Tr. 30).

Her last job was doing clerical work in a bank loan department. She did that job for three years. She was fired because she was "having a lot of confusion" and could not keep things straight. (Tr. 22-25).

Plaintiff testified that she is unable to work because of memory problems, lack of energy, constant pain and depression. (Tr. 25). She described limited daily activities. She said that she sews using a machine for about 45 minutes. She watches TV, reads books and does "minimal housekeeping." She drives only when she has to. She does not go out for walks. (Tr. 28-30).

5

Ms. Furlow graduated from high school and has a certificate in cosmetology. She last work in that field in 1979. (Tr. 30).

Plaintiff takes generic Vicodin for fibromyalgia pain. (Tr. 33). The medicine reduces, but does not eliminate, her pain. (Tr. 34). She cannot walk for a long distance, and cannot sit or stand for long. She does not get enough sleep due to pain. (Tr. 35). She also takes Lexapro for depression. She still has bad days. (Tr. 40-41).

Ronald Hatakeyama, Ph. D., testified as a vocational expert.[3] The ALJ asked him to assume a person with plaintiff's education who could do light work, limited to occasional stooping, kneeling, crouching and crawling, no climbing, and occasional use of ramps and stairs. He testified that she could do plaintiff's past work of clerk and title searcher. The ALJ then added a limitation to simple, one-to- two step activities due to concentration deficit. The VE testified that she could do the jobs of small parts assembler and back office helper, both of which exist in significant numbers in the national and local economies. (Tr. 25-27).

**3.    Medical Records**

In September, 2005, Dr. Laura Winkleman treated Ms. Furlow for depression, anxiety and fibromyalgia. She prescribed Lexapro, Elavil, Vicodin and Xanax. (Tr. 194-195). Plaintiff received counseling services from the Illinois Center for Behavioral Health in 2005 and early 2006 for depression and anxiety. She related to her counselor that pain from fibromyalgia and resulting inability to do what she used to do was causing her to feel depressed and anxious. (Tr 199, 203).

Plaintiff was seen by Dr. Michelle Jenkins on February 1, 2006. She reported being very

---

[3]Dr. Hatakeyama's c.v. is located at Tr. 86. His name is misspelled in the transcript of the evidentiary hearing.

depressed because her son was going back to Iraq. She had financial stressors. She was 5', 1" tall and weighed 190 pounds. She was given samples of Lexapro. (Tr. 251).

Consultative physical and psychological examinations were performed in February, 2006, by, respectively, Dr. Raymond Leung and Harry Deppe, Ph.D. Neither examiner reviewed any records before examining Ms. Furlow. Both exams were essentially normal. Both exams took place well before the amended date of disability. (Tr. 224-228; 229-236).

In March, 2006, Ms. Furlow told a counselor at Illinois Center for Behavioral Health/ Franklin Williamson Human Services that her husband was verbally abusive to the point where it was making her physically ill. She had not previously spoken of this. She hoped to be able to leave him soon. (Tr. 353). On March 29, 2006, she reported that she felt better mentally after having shared her "secret." (Tr. 352). A later note (date illegible) indicates that she had left her husband and felt greatly relieved. (Tr. 347). Ms. Furlow and her husband reconciled shortly thereafter. (Tr. 345). On March 27, 2006, a psychiatric progress note indicates that she was doing better after having a sit-down talk with her husband and beginning to go back to church. She was instructed to continue taking Lexapro and Klonopin. (Tr. 330-331).

In April, 2006, state agency consultants completed mental and physical RFC assessment forms. These assessments were based on the consultative exams that had taken place in February, 2006. The physical assessment concluded that Ms. Furlow was capable of light work (able to frequently lift 10 pounds, occasionally lift 20 pounds, sit/stand/walk for 6 out of 8 hours, unlimited push/pull), limited to only occasional postural activities. (Tr. 270-277). The mental RFC assessment concluded that she had moderate limitations in a few areas, such as the ability to carry out detailed instructions and in the ability to maintain attention and concentration for extended periods, and no marked limitations. (Tr. 266-269).

On April 3, 2006, Dr. Jenkins noted that Plaintiff was being seen at Franklin-Williamson Human Services for her depression and anxiety, and she was doing better on Lexapro and Klonopin. Ms. Furlow said that she sleeps only about an hour at a time and that body aches wake her up. Dr. Jenkins noted diagnoses of anxiety and fibromyalgia. She wrote that her pain was controlled with Lortab. (Tr. 250). No specific physical findings were noted.

On April 7, 2006, a psychiatric progress note from Illinois Behavioral Health indicated plaintiff's relationship with her husband was "further dissolving" and she wanted to leave him again. She complained of increased stress. (Tr. 328). In June, 2006, she told the psychiatrist that she was unable to sleep due to pain and that she had increased daytime fatigue. She was instructed to discontinue Lexapro and to start Cymbalta. It was noted that she had no insurance. (Tr. 324). In July, 2006, she reported that she was not having crying spells since starting Cymbalta and her fibromyalgia pain was reduced. (Tr. 322).

In August, 2006, plaintiff complained to her medical doctor of increasing generalized body pain. Dr. Jenkins noted tenderness in several areas, including cervical, lateral knees and medial elbows. (Tr. 391). The next month, Dr. Jenkins wrote that her fibromyalgia was "stable/improved." She did note tenderness in the cervical spine, trapezius muscles, right lateral knee and both medial elbows. (Tr. 390). In December, 2006, there was a notation of "trigger points - also hips, knees, ankles & hands." The assessment was fibromyalgia. (Tr. 389). In June, 2007, she complained of daily aching, especially in her back and legs. No specific abnormal physical findings were noted. (Tr. 383).

On September 12, 2007, Ms. Furlow told Dr. Jenkins that she was feeling better since she had "kicked husband out due to verbal abuse." She was less frightened and stressed and was sleeping better. She was walking 2 miles per day, which caused some pain but she was trying to

8

do it daily. Her weight was 168 pounds. She was advised to continue with her current medications for fibromyalgia and her depression was noted to be "better since husband kicked out." (Tr. 381). However, on December 11, 2007, she presented to Dr. Jenkins with increased depression and thoughts of suicide. She was back with her husband after his release from jail. Dr. Jenkins recommended contacting a crisis counselor for possible inpatient placement. (Tr. 380).

After speaking with a counselor at Franklin-Williamson Human Services, Ms. Furlow was admitted to Harrisburg Medical Center on December 11, 2007. She was under the care of Dr. Naeem Qureshi, a psychiatrist. She was treated with individual and group therapy and her medication was adjusted. After two days, she was improved and requested to be discharged. She was medically evaluated by Dr. James Alexander, who noted that she had a history of fibromyalgia. She complained of generalized pain. She sometimes smoked marihuana to help her pain and help her to rest. On physical examination, she had a full range of motion of the neck and of all major joints. She had generalized tenderness throughout. (Tr. 367-375).

A psychiatric advanced practiced nurse (APN) in Dr. Qureshi's office saw plaintiff on December 14, 2007, the alleged date of onset of disability. On that date, the nurse noted that she was well-groomed and cooperative. Her mood was tense. She had normal perception and unremarkable thought content. The Axis I diagnoses were depression and anxiety. Her GAF was 50. The treatment plan was Topamax, Lexapro, a referral to counseling, and a recommendation that she read "Co-Dependant No More." (Tr. 366). She was seen by the nurse, Auna Searcy, once a month for the next three months, with similar assessments. (Tr. 359-364). On April 21, 2008, Dr. Qureshi saw Ms. Furlow. He noted that she was stable. Her speech, perception and thought processes were normal. Her thought content was unremarkable. Dr.

9

Qureshi noted no deficits in attention, concentration, memory, intellect, insight, judgment or abstraction. He diagnosed depression and anxiety, and assessed her GAF at 50. (Tr. 357-358).

On January 15, 2008, Dr. Jenkins noted that plaintiff was happier at home, felt better, and that her mood was stable and her pain was controlled. (Tr. 379). On May 13, 2008, Dr. Jenkins again noted that her fibromyalgia and depression were controlled. No abnormal physical findings were noted. (Tr. 378).

On December 4, 2008, APN Searcy completed a mental RFC assessment in which she assessed marked limitations in almost all areas of functioning. (Tr. 398-399). The ALJ rejected this assessment because it was completed by a nurse and because it was inconsistent with the progress notes. (Tr. 14).

On December 10, 2008, Dr. Jenkins completed a medical RFC assessment. She assessed limitations of never lifting more than 10 pounds, and only 2 hours a day sitting and 1 hour each of standing and walking. (Tr. 402-408). Dr. Jenkins also completed a Fibromyalgia Questionnaire in which she stated that Ms. Furlow met the American Rheumatological Society's criteria for fibromyalgia. When asked to identify her signs and symptoms, the doctor said she had nonrestorative sleep, fatigue, depression, dizziness, lack of endurance and anxiety. She opined that Ms. Furlow would be unable to do even sedentary work due to stiffness, pain and depression. (Tr. 411-412). The ALJ rejected this opinion because the doctor did not cite any objective findings to support her conclusions. (Tr. 13).

## Analysis

Ms. Furlow's first point is that the ALJ erred in rejecting the mental RFC assessment prepared by APN Auna Searcy on December 4, 2008. The ALJ declined to give this assessment controlling weight because it was signed by a nurse rather than a doctor, and it was inconsistent

with the progress notes. See, Tr. 14.

A nurse is not an "acceptable medical source." 20 C.F.R. §404.1513. Therefore, her opinions are not entitled to controlling weight under §404.1527. Plaintiff recognizes this, but argues that Nurse Searcy "did the evaluation under the control of Dr. Qureshi," which suggests that the nurse's assessment could be attributed to the doctor. Doc. 24, p. 7. Plaintiff offers no legal support for her argument that the opinions of a nurse could be bootstrapped into an acceptable medical source in this fashion. Regardless of whether the argument could prevail in a proper case, there is no support for it on the present record.

There is no indication in the record that APN Searcy prepared her mental RFC assessment under the control of Dr. Qureshi. Dr. Qureshi did not countersign or otherwise acknowledge the assessment. There is simply no indication in the record that Dr. Qureshi agreed with or was even aware of APN Searcy's assessment. The regulations make a distinction between the opinions of doctors and of nurses in weighing medical evidence. The ALJ did not err by following the regulations in this regard.

Plaintiff's second argument fares better. She argues that the ALJ's assessment of her RFC was not supported by substantial evidence because it rested on a faulty evaluation of medical evidence. Specifically, she argues that it was error to reject the opinions of her treating doctor, Dr. Jenkins, in favor of the opinions of the state agency examiners and consultants.

ALJ Wheeler noted that Dr. Jenkins recorded "numerous subjective complaints apparently caused by ... fibromyalgia," but he remarked twice that there were no objective findings. Tr. 13. He therefore declined to afford controlling weight. The ALJ erred in two respects with regard to his evaluation of Dr. Jenkins' opinions.

First, it is unclear what weight, if any, the ALJ afforded to Dr. Jenkins' opinions. He

merely stated that he did not give them "controlling weight." This was error. If an ALJ determines not to give controlling weight to a treating doctor's opinion, he must then consider the factors set out in 20 C.F.R. §404.1527(d)(2) and determine what weight to give the opinion. ***Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)**; ***Scott v. Astrue*, 2011 WL 3252799, \*5 (7th Cir., August 1, 2011)**.

Further, the ALJ's decision indicates a misunderstanding of the nature of fibromyalgia, which the Seventh Circuit has described as "a common, but elusive and mysterious, disease." ***Sarchet v. Chater*, 78 F. 3d 305, 306 (7th Cir. 1996)**. The cause or causes of the disease are unknown, as is the cure, and "of greatest importance to disability law, its symptoms are entirely subjective." ***Ibid***. There are no laboratory tests to detect the disease or to measure its severity. One sign which points to fibromyalgia is the presence of trigger, or tender, points. As the Seventh Circuit explained, "The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and ... multiple tender spots ... that when pressed firmly cause the patient to flinch." ***Ibid.***

Here, the ALJ was concerned by the lack of "abnormal objective findings" in Dr. Jenkins' treatment notes. However, since the symptoms are "entirely subjective," ***Sarchet, supra***, the lack of objective findings does not undermine Dr. Jenkins' opinions. Dr. Jenkins repeatedly noted the kind of symptoms which the Seventh Circuit states are associated with fibromyalgia: fatigue, inability to sleep and generalized pain. In addition, Dr. Jenkins' records contain a notation of "trigger points - also hips, knees, ankles & hands." (Tr. 389).

In addition to the error in weighing Dr. Jenkins' opinions, the ALJ's assessment of plaintiff's RFC was lacking in substantial support because it relied on the opinions of the state agency examiners and consultants. After declining to give controlling weight to Dr. Jenkins'

opinions, the ALJ went on to refer positively to the opinions of Dr. Leung and Harry Deppe. He said that he agreed with the state agency consultants' assessment of plaintiff's mental and physical RFC. (Tr. 16). The ALJ's RFC assessment was identical to the RFC assessments that had been prepared by the state agency consultants in April, 2006.

The ALJ is required to explain how he reached his conclusions. **Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004); Scott v. Astrue, 2011 WL 3252799 at *6.** Here, ALJ Wheeler permitted Ms. Furlow to amend her alleged date of onset to December 14, 2007. (Tr. 9, 30). The consultative examinations and RFC assessments on which he relied took place in February and April of 2006. The ALJ did not explain how examinations that took place more than 18 months prior to the alleged onset of disability could support his RFC findings. Where the evidence relied upon "does not support the propositions for which it is cited," the ALJ has "failed to build the requisite 'logical bridge' between the evidence and [his] conclusion." **Scott v. Astrue, 2011 WL 3252799 at *6, citing Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009).**

The ALJ failed to recognize that, once he permitted plaintiff to amend her alleged date of onset, the evidence from the state agency examiners and consultants had very little, if any, relevance. It was the ALJ's responsibility to obtain additional medical evidence if same were needed. **Smith v. Apfel, 231 F.3d 433, 437-438 (7th Cir. 2000); Scott v. Astrue, 2011 WL 3252799 at *6.**

The above errors compel the conclusion that the final decision of the Commissioner denying plaintiff's application for DIB and SSI must be reversed and remanded pursuant to sentence four of 42 U.S.C. §405(g). In light of the obvious need to remand this case, the Court will not undertake an exhaustive evaluation of the ALJ's credibility determination. It suffices to point out that the Seventh Circuit has disapproved credibility determinations expressed in the

language used by the ALJ in this case. See, *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010); *Brindisi v. Barnhart*, 315 F.3d 783, 787-788 (7th Cir. 2003).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Furlow is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

It is therefore **ORDERED** that the Commissioner's final decision denying Sheila J. Furlow's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: August 11, 2011.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**United States Magistrate Judge**